Filed 3/18/16  Untermann v. D. Zelinsky & Sons CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHERYL UNTERMANN,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>D. ZELINSKY & SONS, INC.,<br><br>        Defendant and Respondent. | A137513<br><br>(City & County S.F.<br>Super. Ct. No. CGC11275881) |

The trial court granted summary judgment to defendant D. Zelinsky & Sons, Inc. (Zelinsky) in an asbestos action brought by plaintiff Melvin Desin.[1]  On appeal, plaintiffs contend the court erred by finding Zelinsky met its initial burden of production, by finding plaintiffs did not meet their burden, and by excluding from evidence their expert witness declaration.  We shall affirm the judgment.

## I.  BACKGROUND

Desin was an electrician.  He alleged he was exposed to asbestos while working at various job sites and that as a result he developed mesothelioma, an asbestos-related illness.

During the 1960's through the early 1970's, Desin worked alongside painters employed by Zelinsky, a painting contractor, on seven or eight occasions.  According to

---

[1] During the pendency of this appeal, Melvin Desin died.  His death certificate lists mesothelioma as the cause of death.  We have appointed his daughter Cheryl Untermann as his successor in interest on appeal.  (See Code Civ. Proc., §§ 377.20, subd. (a), 377.30, 377.31.)  To avoid confusion, we shall refer to both Desin and Untermann as plaintiffs, although technically Untermann is the sole plaintiff.

1

Desin's deposition testimony, Zelinsky workers patched and sanded walls and joint compound in his presence, at a distance of two or three feet. He did not know the brand name, manufacturer, or supplier of any wall materials Zelinsky workers sanded in his presence or of any joint compound they applied in his presence. Desin could not identify any particular year in which he worked with Zelinsky employees, and he had no recollection of a specific instance in which Zelinsky employees sanded walls. He did not know whether he was exposed to asbestos as a result of Zelinsky's activities.

In a declaration submitted in opposition to Zelinsky's motion for summary judgment, Desin averred that he worked around Zelinsky painters on new construction as well as remodels and that he worked as close as two feet from Zelinsky painters while they sanded joint compound after they applied it to drywall. Zelinsky painters would apply a coat of joint compound, let it dry, then sand the joint compound to smooth it out, and repeat the process. Visible fine dust produced by the sanding would end up on Desin's clothing, face, and hair and on the job site floor.

Desin also submitted an expert declaration of William M. Ewing, an industrial hygienist (the Ewing declaration), who opined that Zelinsky workers more likely than not exposed Desin to asbestos. The Ewing declaration included the following: Work with asbestos generates dust that remains in the air for hours before setting on the ground, and that can be re-suspended when the area is swept. (Paragraph 6.) In commercial and residential construction, after drywall is hung, the joints between the boards are taped with paper and reinforced with joint compound. After each coat of joint compound dries, it is sanded, a process that generates visible debris and dust, which is swept. (Paragraph 10.) Significant exposures to asbestos occur when asbestos-containing joint compound powder is mixed with water and when the joint compound is sanded. (Paragraph 11.)

Ewing explained that he had a bachelor's degree in biology and had taken numerous courses in industrial hygiene, toxicology, and indoor air quality environmental site assessments. He held certificates pursuant to the Asbestos Hazard Emergency Response Act (AHERA) as an inspector, management planner, project designer, and project supervisor. His experience included publishing approximately 20 papers "related

2

to asbestos," serving on committees within the National Asbestos Council, conducting more than 300 industrial hygiene field operations, conducting surveys of over 2,000 buildings, and providing expert testimony in asbestos-related workers' compensation, personal injury, and wrongful death cases. He had been employed as an industrial hygienist since 1978, and had "focused primarily on asbestos since 1978." He had "conducted training, technical assistance, and research on asbestos in buildings." He had been an advisor to the AHERA Regulatory Negotiation Committee, which made regulatory decisions on what asbestos-containing products should be regulated and how exposure should be monitored.

Ewing stated that by the early 1970's, the Consumer Product Safety Commission had estimated that there were over 3,000 asbestos-containing products, including, among many others, drywall and joint compounds. Ewing averred he was familiar with when "these products" were commercially available and when non-asbestos substitutes came into widespread use. (Paragraph 5.) According to Ewing, the first U.S. patent for an asbestos-free joint compound was filed in July 1973 and awarded in June 1975. Ewing asserted that joint compound products "nearly universally" contained asbestos before the mid-1970's, and continued to do so until asbestos use was banned by the Consumer Product Safety Commission, effective 1978. (Paragraph 8.)[2] As a result of the ban, most manufacturers removed asbestos from their products, and it "seem[ed] likely that remaining stocks of asbestos-containing joint compound would have been used up in the ensuing months or year." (Paragraph 9.)

Ewing had reviewed a 1980 article entitled "Occupational Exposure in the Drywall Taping Process," by D.K. Verma and C.G. Middleton, which indicated that there were three types of joint compounds: taping, topping, and all-purpose, and that compounds of each type contained asbestos through the mid-1970's. (Paragraph 12.) Another article Ewing had reviewed, "Drywall Construction and Asbestos Exposure," by Alf Fischbein, M.D., Arthur N. Rohl, Ph.D., Arthur M. Langer, Ph.D., and Irving J.

_____

[2] Aside from a footnote citing an article we will discuss later, Ewing did not refer to any facts or knowledge supporting this statement.

3

Selikoff, M.D., published in 1979, stated that " 'either chrysotile or amphibole asbestos, or both, have been found in 13 out of 15 industrial products; analysis of spackle compounds . . . has demonstrated that they also frequently contain from 5% to 12% by weight of asbestos minerals, as well as quartz,' " and that " 'asbestos-free materials were not widely introduced in the trade until very recently.' " Ewing stated that these articles supported his opinion that the joint compound sanded by Zelinsky painting contractors in Desin's presence in the 1960's and early 1970's contained asbestos. (Paragraph 13.)

Ewing also based his opinion that Zelinsky workers sanded asbestos-containing joint compound in Desin's presence on Desin's interrogatory responses (specifically response number 7), on his review of deposition transcripts of persons most knowledgeable and manufacturer disclosures published in the Federal Register, 55 F.R. 5144 (Feb. 13, 1990), in which certain manufacturers admitted that from at least the 1960's to the early 1970's their drywall products and joint compound contained asbestos, and on his review of deposition transcripts of defense experts in other cases. (Paragraphs 14–18.) Ewing had also reviewed Desin's declaration. Based upon all of the matters recited in his declaration, Ewing concluded that the joint compound to which Desin was exposed by Zelinsky workers sanding it "more likely than not" contained asbestos and that he was exposed to a significant concentration of asbestos fibers from the resulting dust. (Paragraphs 19–22.)

In the interrogatory response that Ewing had reviewed, response number 7, Desin had been asked to identify every document that pertained or related to his alleged exposure to asbestos-containing products distributed, supplied, handled, disturbed, or utilized by Zelinsky. As pertinent here, in response Desin identified "all of KELLY-MOORE's Responses to General Order Nos. 17 and 129" and the deposition transcripts of Michael Zelinsky, a former employee and estimator for Zelinsky, taken in 2006 in another case, *Betti v. American Biltrite* (*Betti*). According to the interrogatory responses, Michael Zelinsky had testified that he purchased Kelly-Moore joint compounds and mud and Paco products, and that Zelinsky used Kelly-Moore " 'most of all' . . . because 'it was the cheapest.' " The interrogatory response also stated that Kelly-Moore's person

most knowledgeable had testified, in other lawsuits, that Paco products contained asbestos from 1960 to 1978 and that efforts to remove asbestos did not begin until the early 1970's; that William E. Longo had prepared reports and studies indicating Kelly-Moore Paco joint compound contained asbestos; and that Kelly-Moore acquired Paco in 1960. The interrogatory responses noted that a 1975 article by Rohl, Langer, Selikoff, and William J. Nicholson stated that analysis of 10 industrial drywall taping compounds showed that 9 contained chrysotile, and that the 1979 article by Fischbein, Rohl, Langer, and Selikoff reported that of 15 drywall taping and spackling compound, 13 contained asbestos.

In reply, Zelinsky submitted further excerpts of the 2006 deposition of Michael Zelinsky in the *Betti* case, in which he testified he worked as an estimator for Zelinsky beginning in 1963, began working as a painter from approximately 1968 through 1969, and worked as a purchasing agent for a year in 1970 or 1971. During the time he was an estimator, he saw Kelly-Moore products used on his jobs no more than 10 percent of the time. He could not estimate the amount of Paco joint compound he ordered on behalf of Zelinsky, but could not recall ordering any type of joint compound other than Paco when he was a purchasing agent in 1970 or 1971. Drywall work was not a large part of Zelinsky's business.

Zelinsky objected to portions of Desin's declaration and the Ewing declaration. As to Desin's declaration, the trial court sustained objections to his statements that while working as an electrician in the 1960's to early 1970's, he worked at job sites where Zelinsky painters worked alongside him; that Zelinsky painters normally applied more than one coat of joint compound, sanding it after each application, and using either a pole sander or hand sandpaper; and that the resulting fine dust ended up on his clothes, dust, hair, and the job site floor. The trial court also sustained Zelinsky's objections to each of

the paragraphs of the Ewing declaration already summarized in this opinion.[3] (Paragraphs 5–6 & 8–22.)

The trial court granted the motion for summary judgment and entered judgment in Zelinsky's favor.

## II. DISCUSSION

### A. Standard of Review

"We review a grant of summary judgment de novo. [Citation.] In performing our de novo review, we employ a three-step analysis. 'First, we identify the issues raised by the pleadings. Second, we determine whether the movant established entitlement to summary judgment, that is, whether the movant showed the opponent could not prevail on any theory raised by the pleadings. Third, *if the movant has met its burden*, we consider whether the opposition raised triable issues of fact.' [Citations.] To shift the burden, the defendant must conclusively negate a necessary element of the plaintiff's case or demonstrate there is no triable issue of material fact requiring a trial. [Citation.] If the evidence does not support judgment in the defendant's favor, we must reverse summary judgment without considering the plaintiff's opposing evidence. [Citation.] Any evidence we evaluate is viewed in the light most favorable to the plaintiff as the losing party; we strictly scrutinize the defendant's evidence and resolve any evidentiary doubts or ambiguities in the plaintiff's favor. [Citation.]" (*Barber v. Chang* (2007) 151 Cal.App.4th 1456, 1462–1463.)

Thus, in considering a motion by a defendant, " 'we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial . . . .' (*Guz*[ *v. Bechtel National, Inc.* (2000)] 24 Cal.4th [317,] 334.) [A defendant bears] the burden 'to make a prima facie showing of the nonexistence of any triable issue of material fact; *if he carries his burden of production, he causes a shift*, and the opposing party is then

---

[3] The trial court's signed ruling on the objections, filed June 29, 2012, is found at Volume 4, pages 944–963 of the Appellant's Appendix.

subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.' (*Aguilar*[ *v. Atlantic Richfield Co.* (2001)] 25 Cal.4th [826,] 850 [(*Aguilar*)], italics added.)" (*Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 940; see *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 840 [responding plaintiff has no evidentiary burden unless moving defendant has first met initial burden].) In order to meet its burden on a claim for which the plaintiff would have the burden of proof by a preponderance of the evidence, "the defendant must present evidence that would preclude a reasonable trier of fact from determining that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' " (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003; and see *Aguilar*, 25 Cal.4th at p. 850.)

" 'A different analysis is required for our review of the trial court's . . . rulings on evidentiary objections. Although it is often said that an appellate court reviews a summary judgment motion "de novo," the weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard. [Citations.]' [Citation.]" (*Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335 (*Miranda*); accord, *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852.) We find such an abuse of discretion only if the trial court has exceeded the bounds of reason. (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679.) We consider and construe liberally only admissible evidence in deciding whether there is a triable issue of fact. (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761.)

## B. **Zelinsky Shifted the Burden**

Zelinsky's motion for summary judgment was made on the ground that plaintiffs had failed to produce any admissible evidence showing Desin was exposed to asbestos supplied, distributed, handled, disturbed, or utilized by Zelinsky. Plaintiffs contend

Zelinsky's evidentiary showing was insufficient to shift the burden to raise a triable issue of fact.

"A plaintiff claiming asbestos-related injuries must establish some exposure to the asbestos-containing product or activity for which the defendant is responsible. [Citation.] If there has been no exposure, the plaintiff cannot demonstrate that the defendant caused his or her injuries. [Citation.]" (*Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 589 (*Collin*).) Thus, "[a] threshold issue in asbestos litigation is exposure to the defendant's product. The plaintiff bears the burden of proof on this issue. [Citations.] If there has been no exposure, there is no causation. [Citation.] Plaintiffs may prove causation in an asbestos case by demonstrating that the plaintiff's or decedent's exposure to the defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate dose of asbestos the plaintiff or decedent inhaled or ingested, and hence to the risk of developing asbestos-related cancer. [Citation.]" (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1103; see *Rutherford v. Owens-Williams, Inc.* (1997) 16 Cal.4th 953, 976–977.) Direct evidence of exposure is not required; rather, the plaintiff may show from circumstantial evidence that defendant's asbestos-containing product was "sufficiently prevalent" at the work site to warrant an inference that he was exposed to it in the course of his work with or around asbestos. (*Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1420.)

In support of its motion, Zelinsky submitted evidence showing Desin worked alongside Zelinsky painters on seven or eight occasions from the 1960's to the early 1970's, but that he did not recall a specific instance in which Zelinsky employees sanded walls or a particular year in which he worked with Zelinsky employees. He did not know the brand name, manufacturer, or supplier of any materials Zelinsky workers sanded or applied in his presence and did not know whether Zelinsky's activities exposed him to asbestos. Desin's interrogatory responses indicated that many drywall and spackling products before 1978 contained asbestos, that Zelinsky obtained products from Paco and Kelly-Moore, and that Paco's drywall products contained asbestos. However, the responses do not indicate that all such products contained asbestos or that Zelinsky

8

obtained all of its drywall products from Paco.  Nor do the responses indicate plaintiffs possessed *admissible* evidence of the contents of Paco or Kelly-Moore products.

Plaintiffs draw our attention to no case in which a similar showing has been held insufficient to shift the burden on summary judgment in an asbestos case.  A defendant can meet its burden on summary judgment by showing, through deposition testimony or the plaintiffs' factually devoid responses to comprehensive discovery justifying an inference of an absence of evidence, that the plaintiffs cannot establish an element of their case.  (*Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1228–1231 (*Casey*); *Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 102–103 (*Andrews*).) *Casey*, decided by this division, is instructive.  The decedent there, John Casey, worked as a plumber and pipefitter at numerous jobsites, and was later diagnosed with mesothelioma.  The defendant, Perini Corporation, had allegedly been the general contractor at three of those jobsites.  (*Casey*, *supra*, 206 Cal.App.4th at p. 1225.)  Casey's deposition testimony revealed that he did not know if any of the products he used or others used in his presence contained asbestos, he could not identify the brand name, manufacturer, or supplier of any materials that generated dust later swept up or disturbed by Perini workers, and he did not know if the dust to which he was exposed contained asbestos.  (*Id*. at pp. 1225–1226.)  The plaintiffs' interrogatory responses claimed that Casey had been exposed to asbestos-containing surfacing materials at the jobsites, but never identified the brand name or suppliers of any surfacing materials used at the jobsites, provided no evidence regarding the contents of the construction materials used at the jobsites, and did not identify anyone with knowledge of the contents of such materials.  (*Id*. at p. 1226.)

The trial court granted Perini's motion for summary judgment, and this court affirmed the judgment.  (*Casey*, *supra*, 206 Cal.App.4th at pp. 1225, 1228.)  We reasoned that Casey himself had no knowledge of whether the products used or disturbed in his presence contained asbestos, and that plaintiffs' interrogatory responses did not state "specific facts showing that Casey was actually exposed to asbestos and/or asbestos-containing products due to Perini's activities" and failed to identify the products to which

9

he was exposed or the extent of his exposure. (*Id*. at pp. 1230–1231.) Thus, we concluded, plaintiffs' discovery responses stated in effect that they lacked specific facts supporting their claims, and Perini met its initial burden of presenting evidence to make a prima facie case that there were no triable issues of fact regarding causation. (*Id*. at p. 1231.)

We conclude that Zelinsky has similarly met its initial burden here. Desin's own testimony showed he did not know if he had been exposed to asbestos as a result of Zelinsky's activities, that he could not recall any particular time or job in which he worked in proximity with Zelinsky workers, and that he did not know the brand name, supplier, or manufacturer of any materials they applied or sanded in his presence. The discovery responses indicate that Paco products contained asbestos and that Zelinsky used Kelly-Moore products, but they do not show that drywall products used by Zelinsky during the 1960's and early 1970's necessarily contained asbestos, and they do not indicate that plaintiffs possessed or were likely to possess admissible evidence that Desin was exposed to asbestos as a result of exposure to Paco products disturbed by Zelinsky.

### C. Desin Did Not Meet His Burden

The burden thus shifted to Desin to demonstrate a triable issue of fact as to whether he was exposed to asbestos-containing dust as a result of Zelinsky's activities. Plaintiffs acknowledge that the question of whether the dust Desin encountered contained asbestos may only be answered by an expert. The trial court, however, sustained Zelinsky's objections to the statements in the Ewing declaration that were offered to provide that evidence. We must decide whether the court abused its discretion in doing so.

" ' "An expert opinion has no value if its basis is unsound. [Citations.] . . . Evidence Code section 801, subdivision (b), states that a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on 'in forming an opinion upon the subject to which his testimony relates.' " ' " (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 186, italics omitted; and see *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524 ["[H]earsay information of

10

a type *reasonably relied upon* by professionals in the field in forming an opinion on the subject may be used to support an expert opinion"].)  Thus, under Evidence Code sections 801 and 802,[4] "the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative."  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772.)  The court does not weigh the persuasiveness of an expert opinion:  "Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture."  (*Id.* at p. 772.)  As this court explained in *Casey*, "an expert's opinion ' "may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact.  [Citation.]  Moreover, an expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.  [Citations.]" [Citation.]' [Citation.]" (*Casey*, *supra*, 206 Cal.App.4th  at p. 1233.)

In its objections to the pertinent statements in the Ewing declaration, Zelinsky contended, in broad outline, that the statements lacked either personal knowledge or other foundation and that they were irrelevant because Desin had not identified the brand, manufacturer, supplier, or composition of any joint compound Zelinsky workers had used in his presence.  Zelinsky contended that even if many available joint compounds contained asbestos, the Ewing declaration showed that non-asbestos-containing joint

_____

[4] Evidence Code section 802 provides:  "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion.  The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based."

compounds were also available during the relevant time period and the declaration, therefore, did not provide a basis to conclude that Zelinsky workers actually exposed Desin to asbestos-containing products.

Bearing in mind the breadth of the trial court's discretion in making evidentiary rulings (*Miranda*, *supra*, 187 Cal.App.4th at p. 1335), we find no abuse of that discretion here. We first note that although Ewing described his general background and training, nothing in that recitation appears to qualify him to opine on drywall work or the composition of joint compounds. In this respect, his declaration stands in contrast to that at issue in *Ganoe v. Metalclad Insulation Corp.* (2014) 227 Cal.App.4th 1577, upon which plaintiffs rely; the expert there had extensive relevant work experience, consisting of 25 years working as a pipe coverer, insulator, and asbestos worker, in addition to being certified and trained about safety issues related to asbestos. (*Id.* at p. 1586, fn. 4.) This experience, the appellate court concluded, provided an adequate foundation for the expert's opinion that the installation of certain machines in 1974 required removal of insulation that more likely than not contained asbestos. (*Ibid.*)

We are not persuaded that the trial court abused its discretion in concluding Ewing's opinions lacked foundation. Ewing stated he was familiar with when over 3,000 different asbestos-containing products (including thermal system insulation, gaskets and packing, asbestos-cement pipe, refractory materials, fireproofing, drywall and joint compounds, asbestos-cloth products, floor tiles, and roofing materials) were commercially available and when non-asbestos substitutes came into widespread use. This generalized statement of familiarity with a host of products does not demonstrate that Ewing had specific knowledge about all joint compounds, and hence does not provide an adequate foundation for Ewing's opinion that Desin was exposed to asbestos by Zelinsky workers or that joint compound "nearly universally contained asbestos" before the mid-1970's.

Nor do the other materials upon which Ewing relied fill the gap. He referred to depositions of other expert witnesses taken in different cases. However, the foundation of those witnesses' opinions cannot be adequately discerned from this record. Moreover,

12

the witnesses in those cases had no knowledge of the types or composition of joint compounds sanded in Desin's presence.

Ewing also relied on two articles. One of them, "Occupational Exposure to Asbestos in the Drywall Taping Process," by Verma and Middleton, was based on an investigation in the Canadian province of Alberta begun in 1975. The article reports that during the study period, "most joint compounds were said to contain between 3–6% of chrysotile asbestos by weight," and that "[t]hree types of joint compounds are available: taping, topping, and all purpose, all of which contain asbestos." This article does not establish that all—or even most—joint compounds available from the 1960's through early 1970's at the work sites Desin shared with Zelinsky employees contained asbestos.

The other article upon which Ewing relies, "Drywall Construction and Asbestos Exposure," by Fischbein et al., published in 1979, states that asbestos had been found "in 13 out of 15 industrial products" and that "asbestos-free materials were not widely introduced into the trade until very recently." These statements, however, do not indicate the total number of joint compound products available during the 1960's through early 1970's, and in any case, they demonstrate that not all joint compounds contained asbestos.[5]

Ewing also pointed to Desin's own interrogatory response number 7 and other interrogatory responses and depositions. However, he provided no " ' "reasoned explanation' " " of why this discovery leads to his ultimate conclusion. (*Casey*, *supra*, 206 Cal.App.4th at p. 1233.) Moreover, as we have explained, the Ewing declaration indicates on its face that even if most drywall products contained asbestos before the late 1970's, non-asbestos-containing products were also available. In light of Ewing's lack of

---

[5] Ewing also relied on disclosures of asbestos-containing products made by manufacturers pursuant to the Asbestos Information Act of 1988, Pub. Law 100–577, which "requires former and current manufacturers and processors of certain asbestos products to submit information identifying their products to the [Environmental Protection Agency]." (55 Fed.Reg. 5144.) The fact that manufacturers disclosed products that *did* contain asbestos, however, does not mean that there were no other joint compounds that did *not* contain asbestos.

knowledge of the particular products to which Desin was exposed, we conclude the trial court did not abuse its discretion in excluding the substantive portions of his declaration.

Plaintiffs also argue that Michael Zelinsky's testimony in the *Betti* case provides evidence that Desin was exposed to asbestos-containing Paco or Kelly-Moore joint compounds. Michael Zelinsky did testify that Zelinsky bought " 'mostly Kelly-Moore mud' " because it was the " 'cheapest' " and that he could not recall purchasing any type of joint compound other than Paco when he was a purchasing agent in 1970 or 1971. However, Desin was unable to identify any particular year in which he worked with Zelinsky employees, and Michael Zelinsky's testimony as to the joint compound he purchased for Zelinsky during one year in 1970 or 1971 does not show that it was more likely than not that Zelinsky employees exposed Desin to Paco products during the seven or eight occasions he worked alongside them in unspecified years in the 1960's and early 1970's.[6]

In the absence of admissible evidence that Desin was exposed to asbestos-containing products as a result of the activities of Zelinsky employees, we conclude plaintiffs failed to carry the burden to show a triable issue of material fact.

### III.    DISPOSITION

The judgment is affirmed.

---

[6] Michael Zelinsky's testimony is, in any event, inadmissible hearsay because defendant here was not represented at that deposition taken in an entirely different case, and Desin has not offered any grounds for its admissibility. (Evidence Code § 1291.)

14

 

                                    _____\
                                    Rivera, J.

We concur:


_____\
Reardon, Acting P.J.


_____\
Streeter, J.

15

A137513